IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE SHADUR

MAGISTRATE JUDGE KEYS

01C 6529

|  |  |
|---|---|
| IBP, INC., and FOODBRANDS AMERICA, INC. | ) ) ) |
| Plaintiffs, | ) ) Civil Action No. |
| v. | ) ) Jury Trial Demanded ) |
| ANDREW J. ZAHN, and PHILIP SEXAUER, | ) ) ) |
| Defendants. | ) ) |

FILED-EDS
01 AUG 22 AM 11: 42
CLERK
U.S. DISTRICT COURT

**DOCKETED**

AUG 2 2 2001

# COMPLAINT

Plaintiffs IBP, inc. ("IBP"), and Foodbrands America, Inc. ("Foodbrands"), for their complaint against Andrew J. Zahn ("Zahn") and Philip Sexauer ("Sexauer"), allege as follows:

      1.     This action is brought to obtain recovery for injuries exceeding $70,000,000 IBP and Foodbrands ("Plaintiffs") suffered due to Zahn and Sexauer's false and fraudulent inflation of the accounting records and financial reports of DFG Foods LLC ("DFG"), Plaintiffs' wholly owned subsidiary. For the purpose of misrepresenting the financial position and results of the business operations of DFG to Plaintiffs, Zahn and Sexauer knowingly, intentionally, and recklessly: 1, made and caused to be made false and fraudulent statements and representations in the accounting records and financial reports of DFG; 2, omitted and caused to be omitted from the accounting records and financial reports of DFG material information relating to the financial position and business operations of DFG; 3, made and caused to be made statements and other representations to Plaintiffs' employees designed to lull Plaintiffs into a false sense of security regarding the state of the accounting records and financial reports of DFG when Plaintiffs' employees began to question the propriety of some of the false and fraudulent statements and representations Zahn and Sexauer made and caused to be made in the accounting records and financial reports of DFG; 4, repeatedly took steps to conceal from Plaintiffs the fact that Zahn and Sexauer had made and caused to be made false and fraudulent statements and representations in the accounting records and financial reports of DFG in furtherance of the foregoing false and fraudulent activity; and 5, Zahn repeatedly engaged in false and fraudulent self-dealing by causing DFG to make unauthorized payments to third parties for the personal financial benefit of Zahn and his family, in violation of the fiduciary duty Zahn owed Plaintiffs as an officer of DFG and Foodbrands.

2.     Zahn knowingly, intentionally, and recklessly engaged in the foregoing misconduct as an officer of DFG and Foodbrands and therefore violated the fiduciary duties he owed to Plaintiffs. Sexauer knowingly, intentionally, and recklessly engaged in the foregoing misconduct as an officer of DFG and therefore violated the fiduciary duties he owed to Plaintiffs.

3.     Zahn and Sexauer knowingly, intentionally, and recklessly manipulated the accounting records and financial reports of DFG, and caused those records and reports to be manipulated, falsely and fraudulently to inflate the earnings of DFG so as to present to Foodbrands a more positive financial picture of DFG than existed in reality.

4.     After Zahn and Sexauer left their positions as officers at DFG, Plaintiffs discovered that Zahn and Sexauer had knowingly, intentionally, and recklessly caused the accounting records and financial reports of DFG to be falsely and fraudulently inflated by more than $50 million by adding and causing to be added tens of millions of dollars worth of false and fraudulent entries in DFG's inventory, accounts receivable, prepaid marketing and other asset accounts. As a direct result of this misconduct, Plaintiffs were required to write-off more than $50 million in assets from the accounting records and financial reports of DFG.

5.     As a direct and proximate result of Zahn's and Sexauer's false and fraudulent manipulation of the accounting records and financial reports of DFG, Zahn and Sexauer caused IBP to pay millions of dollars to Zahn (via Diversified Food Group LLC) under the "adjustment to purchase price" and "contingent purchase price" provisions of the Asset Purchase Agreement and the amended Asset Purchase Agreement between IBP and Diversified Food Group LLC, Cohen's Kosher Foods LLC, and Restauranic, Inc.

6.     As a direct and proximate result of Zahn's and Sexauer's false and fraudulent manipulation of DFG's accounting records and financial reports, the financial well

3

being and value of DFG was devastated, causing Plaintiffs to write-off $60.3 million in goodwill from the accounting records and financial reports of DFG.

## THE PARTIES

7.      IBP, inc. is a Delaware corporation with its principle place of business in Dakota Dunes, South Dakota.  IBP has worldwide business locations.  IBP's products are sold in Illinois.  Among other things, IBP is engaged in the business of meatpacking and processing.

8.      Foodbrands is a Delaware corporation with its principle place of business in Oklahoma City, Oklahoma.  Foodbrands is an indirect wholly owned subsidiary of IBP. Foodbrands owns and operates a number of subsidiary companies, all of which are involved in some aspect of the food manufacturing business.  One of Foodbrands' indirect wholly owned subsidiaries is DFG.  DFG is a limited liability company formed to acquire the appetizer business assets and operations of four companies, Diversified ("Diversified"), Cohen's Kosher Foods LLC ("Cohen's), and Restauranic, Inc. ("Restauranic"), and, subsequently, Wilton Foods, Inc. ("Wilton").  Among other things, DFG is in the business of manufacturing and selling appetizers, hors d'oeuvres, canapés, and pre-packaged meals for airlines and other uses.

9.      Zahn is a resident of and is domiciled in Highland Park, Illinois.  For much of the period relevant to the events referenced in this complaint, Zahn was the President of DFG and a Senior Vice President of Foodbrands.

10.      Sexauer is a resident of and is domiciled in Lake Forest, Illinois.  From the time IBP acquired DFG in October 1998 until early 2000, Sexauer held the position of Chief Financial Officer of DFG.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action under 28 U.S.C. §§
1331 and 1332 because the matter in controversy exceeds $75,000 and is between citizens of
different states. IBP and Foodbrands are Delaware corporations with their principle places of
business in South Dakota and Oklahoma, respectively. Zahn and Sexauer are citizens of and are
domiciled in Illinois.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because
defendants reside in this judicial district and a substantial part of the events and omissions giving
rise to the claims in this complaint occurred in this judicial district.

## BUSINESS CONTEXT OF THE EVENTS

13.     On or about October 19, 1998, IBP acquired Diversified, Cohen's, and
Restauranic pursuant to an Asset Purchase Agreement. At this time, Zahn was the Chief
Executive Officer of each of the companies. Zahn owned 27% of Diversified and was one of its
founders and managing members.

14.     IBP acquired Diversified, Cohen's, and Restauranic through a newly
formed subsidiary of Foodbrands, DFG Foods LLC ("DFG"). Zahn served as President of the
new subsidiary and was also made an executive officer of Foodbrands. Sexauer served as Chief
Financial Officer of DFG from the time the DFG Business was acquired until leaving DFG's
employment in January, 2000.

15.     The Asset Purchase Agreement between IBP and Diversified, Cohen's,
and Restauranic governed the terms of IBP's purchase of Diversified, Cohen's, and Restauranic.
The Asset Purchase Agreement was assignable by IBP, with IBP completing its obligations
under the agreement through its Foodbrands subsidiary. Therefore, while the Asset Purchase

Agreement specifically identifies IBP, the Plaintiffs jointly performed the obligations under the agreement and are jointly entitled to its benefits.

16.     The terms of the Asset Purchase Agreement required the Plaintiffs to pay Zahn and the other owners of the three companies in stages: a preliminary payment termed the "closing purchase price" at the time the sale closed, a second payment termed the "adjustment to purchase price" in 1999, and possible payments of additional sums termed "contingent purchase price(s)" in each of the next three years, 1999-2001. Zahn and the other owners of the three companies would receive the "contingent purchase price" payments if and only if DFG met certain earnings targets in those years as specified the Asset Purchase Agreement.

17.     Under the Asset Purchase Agreement, Plaintiffs and Diversified, Cohen's, and Restauranic specifically agreed that DFG's financial information and statements would be prepared in accordance with generally accepted accounting principles ("GAAP"). The purchase price was to be determined, in part, based upon various financial results of DFG as determined by GAAP. Zahn and other prior owners of Diversified, Cohen's, and Restauranic represented and warranted that such financial statements and records had been prepared in accordance with GAAP.

18.     On or about October 19, 1998, Plaintiffs paid Zahn and the other owners of Diversified, Cohen's, and Restauranic a "closing purchase price" of $72,442,124.50 to acquire Diversified, Cohen's, and Restauranic pursuant to the Asset Purchase Agreement. Plaintiffs based their decision to acquire Diversified, Cohen's, and Restauranic and their determination of the price for the acquisition upon an analysis of information Zahn and Sexauer provided and caused to be provided to IBP about the financial position and operations of Diversified, Cohen's, and Restauranic.

19.     Because the sale occurred in October 1998, Plaintiffs could not base their purchase upon a financial analysis of the earnings performance of Diversified, Cohen's, and Restauranic for the entire year 1998.  In agreeing to the "closing purchase price" of $72,442,124.50, and to the other future payments noted below, Plaintiffs relied upon certain projections of the earnings performance of the three companies for the entire year 1998 and upon assurances from Zahn as to the expected future earnings performance thereafter.  Assurances regarding DFG's future financial performance were critical to Plaintiffs' willingness to pay the overall purchase price

20.     In an effort to allow Plaintiffs to gauge the purchase price to actual earnings performance for the year 1998, Paragraphs 1.5(a) and (d) of the Asset Purchase Agreement provide that the "closing purchase price" would be subject to adjustment in 1999 based upon the actual earnings performance for the entire year 1998.  Paragraph 1.5(d) provides a formula by which the amount of this "purchase price adjustment" was to be calculated, with Plaintiffs paying Zahn and the other owners of Diversified, Cohen's, and Restauranic anywhere from $0 to $7,000,000.

21.     On or about May 26, 1999, Plaintiffs paid Zahn and the other owners of Diversified, Cohen's, and Restauranic a "purchase price adjustment"of $1,596,191, which payment was determined by the total year-end 1998 earnings figures for DFG that Zahn and Sexauer provided to Plaintiffs.  Plaintiffs paid Zahn and the other owners of Diversified, Cohen's, and Restauranic the $1,596,191 in reliance upon Zahn and Sexauer's representations as to the 1998 earnings amounts.

22.     Paragraph 1.6 of the Asset Purchase Agreement provides that Zahn and the other owners of Diversified, Cohen's, and Restauranic also stood to receive "contingent

purchase price" payments if DFG beat certain earnings targets for the years 1999, 2000, and 2001. Zahn and the other owners of Diversified, Cohen's, and Restauranic would receive "contingent purchase price" payments, which was a portion of whatever earnings DFG realized in excess of the target in a given year. If DFG failed to beat the financial target in a given year, Zahn and the other owners of Diversified, Cohen's, and Restauranic would not receive a "contingent purchase price" payment that year.

23. Prior to the time that Plaintiffs acquired Diversified, Cohen's, and Restauranic, Zahn and his senior staff had begun negotiations to acquire Wilton. When Plaintiffs acquired Diversified, Cohen's, and Restauranic, DFG had not yet acquired Wilton. When Plaintiffs acquired Diversified, Cohen's, and Restauranic, the parties had the understanding that Plaintiffs would thereafter acquire Wilton, at which time the Asset Purchase Agreement would be amended.

24. On or about June 28, 1999, IBP's subsidiary and DFG's parent corporation, Foodbrands, acquired Wilton. Foodbrands incorporated Wilton's operations as part of DFG's operations. The parties to the Asset Purchase Agreement then amended it to provide among other things that the Wilton owners would share in any "contingent purchase price" payments that might be made based upon DFG's earnings (now including Wilton) performance in 1999, 2000, and 2001 and the earnings targets were adjusted to account for the projected earnings of Wilton.

25. On or about April 14, 2000, IBP paid Diversified $7,762,765 as a "contingent purchase price" payment for DFG's performance in 1999. In making this payment, Plaintiffs relied upon financial performance and earnings figures Zahn and Sexauer provided and caused to be provided. Acting on behalf of Diversified, Zahn caused the proceeds of this

8

"contingent purchase price" payment to be distributed to the owners of Diversified, Cohen's, Restauranic, and Wilton.

## THE TREATMENT OF FINANCIAL INFORMATION WITHIN THE IBP FAMILY OF COMPANIES

26.     At the time Plaintiffs acquired Diversified, Cohen's, and Restauranic and consolidated them into DFG, Plaintiffs positioned DFG as a subsidiary of Foodbrands. Zahn was named a Senior Vice President of Foodbrands and reported directly to Foodbrands' President.

27.     The computer system on which the accounting and financial information of the DFG Business was stored and which was acquired with the DFG Business, was not compatible with Foodbrands' system. Accordingly, although Foodbrands' financial staff had direct access to the financial information of almost all of its subsidiaries, Foodbrands did not have such access to DFG's financial and accounting information. Foodbrands was in the process of developing a common computer system for all its subsidiaries. Until that system was complete, Foodbrands had to rely upon Zahn, Sexauer, and DFG's other executives to provide it with the financial and accounting information it needed to oversee DFG's business operations. Zahn and Sexauer were well aware that Foodbrands had limited access to DFG's detailed financial and accounting information and that Foodbrands relied upon Zahn and Sexauer to provide that information.

28.     Because DFG was newly acquired and involved a new line of products, customers, and marketing, Foodbrands also had to rely upon Zahn, Sexauer, and DFG's other executives even more than normal because Foodbrands was not yet familiar with the details of how DFG's business operated. DFG was a "niche" business in which Plaintiffs had not previously participated and had no internal operating expertise.

9

29.     Foodbrands followed a business philosophy of integrating and operating acquisitions like DFG so as to allow them to run semi-autonomously. Foodbrands managed those companies primarily by review of financial information Foodbrands required those companies to provide on a regular basis. Among other things, Foodbrands required those companies to provide it with budgets detailing how the companies planned to perform and periodic reports on how those businesses actually were performing. In addition, Foodbrands supplemented these data by discussing the companies' business operations with senior executives, like Zahn and Sexauer, during monthly management meetings, weekly telephone conference calls, and other daily business contacts via telephone calls, faxes, and e-mails.

30.     To ensure that its business units provided Foodbrands with financial information based upon reliable and uniform accounting principles, Foodbrands required its business units to adhere to Foodbrands' Accounting Policies and Procedures Manual. This manual set the rules for financial reporting within Foodbrands and its business units. Among other things, the manual outlines the way in which Foodbrands' units were to handle accounting issues relating to inventory cost accounting, accounts receivables, and prepaid marketing expenses. The manual also provided that all accounting within Foodbrands and its units was to accord with GAAP.

31.     For the foregoing reasons, it was absolutely essential to Foodbrands' business operation that its subsidiaries provided it with complete, accurate, and truthful financial information. This was especially true with regard to DFG since Foodbrands did not have direct access to DFG's financial information and did not have detailed familiarity with DFG's business operations.

32.     At the time he became an employee of Foodbrands as President of DFG, Zahn promised to faithfully serve and further the interests of Foodbrands and DFG in every lawful way, giving honest, diligent, loyal and cooperative service to Foodbrands and DFG. Zahn also promised to comply with all reasonable rules and policies of Foodbrands and DFG including the accounting policies and procedures.

33.     As an officer of Foodbrands and DFG, Zahn owed those companies and their parent corporation, IBP, certain fiduciary duties, meaning Zahn had the duty affirmatively to protect the interests of DFG and Foodbrands, to refrain from doing anything that would work injury upon DFG and Foodbrands, and was obliged to handle all his affairs relating to DFG and Foodbrands with honesty, loyalty, good faith and fairness.

34.     As an officer of DFG, Sexauer owed DFG and its parent corporations, IBP and Foodbrands, certain fiduciary duties, meaning that Sexauer had the duty affirmatively to protect the interests of DFG, to refrain from doing anything that would work injury upon DFG, and was obliged to handle all his affairs relating to DFG with honesty, loyalty, good faith and fairness.

35.     Shortly after Plaintiffs acquired the DFG businesses, Foodbrands employees met with Zahn and Sexauer to review Foodbrands' operating policies. Foodbrands employees gave Zahn and Sexauer a copy of Foodbrands' Accounting Policies and Procedures Manual and explained that Foodbrands required all its business units to follow the rules of the manual and to handle its accounting in compliance with generally accepted accounting principles (GAAP). The Foodbrands employees explained other financial reporting and accounting requirements DFG would have to meet as well: Foodbrands would manage DFG primarily by reviewing financial information Foodbrands required DFG to provide on a regular basis; among

11

other things, Foodbrands would require DFG to provide it with budgets predicting how DFG would perform and reports on how DFG actually did perform.

36.     Throughout the rest of 1998 and the first nine months of 1999, Zahn and Sexauer had regular contact with Foodbrands' financial and operations staff and routinely provided DFG financial information to Foodbrands. Among other places, these contacts occurred in daily telephone calls or emails, weekly management conference calls and the monthly face-to-face management meetings. Zahn and Sexauer repeatedly told Foodbrands, and otherwise affirmatively purported to comply with Foodbrands' accounting policies and procedures and with Foodbrands' other policies and requirements.

## THE FRAUD SCHEME

37.     From the time IBP consolidated Diversified, Cohen's, and Restauranic into DFG in October 1998 until the time Zahn left the employ of DFG in September 2000, Zahn knowingly, intentionally, and recklessly employed and caused other DFG employees to employ flawed accounting practices for the purpose of falsely and fraudulently inflating the earnings of DFG, thus presenting to Foodbrands a more positive financial picture of DFG than existed in reality.

38.     From the time IBP consolidated Diversified, Cohen's, and Restauranic into DFG in October 1998 until the time Sexauer left the employ of DFG in January 2000, Sexauer knowingly, intentionally, and recklessly assisted Zahn in his scheme to employ and caused other DFG employees to employ improper accounting practices for the purpose of falsely and fraudulently misrepresenting the financial condition of DFG to Foodbrands and IBP.

39.     Zahn and Sexauer knowingly, intentionally, and recklessly used improper accounting practices falsely and fraudulently to inflate the earnings of DFG and to conceal that

they had done so. Zahn and Sexauer did this to cause Plaintiffs to pay millions of dollars to Zahn (via his ownership of Diversified) under the Asset Purchase Agreement and the amended Asset Purchase Agreement.

40.    As a part of the scheme to defraud, Zahn rewarded Sexauer for his assistance in this scheme by paying Sexauer approximately $240,000, consisting of bonuses of approximately $115,000 and another $125,000 in the form of a severance payment in violation of Foodbrands' policy, and by providing Sexauer with ongoing employment in other Zahn business ventures after his departure from DFG.

41.    From the time IBP consolidated Diversified, Cohen's, and Restauranic into DFG in October 1998 until the time Zahn left the employ of DFG in September 2000, Zahn knowingly, intentionally, and recklessly made and caused other DFG employees to make unauthorized payments from DFG finances to third parties for the personal financial benefit of Zahn and his family, in violation of the fiduciary duties Zahn owed Plaintiffs as an officer of DFG and Foodbrands.

42.    Zahn and Sexauer falsely and fraudulently manipulated DFG's financial reports to Foodbrands and IBP by knowingly, intentionally, and recklessly using a wide range of improper accounting practices which violated Foodbrands' Accounting Policies and Procedures Manual and GAAP, including but not limited to false and fraudulent inflation of figures relating to DFG's inventory, accounts receivable and prepaid accounts and related understatement of expenses.

43.    Throughout the course of the scheme to defraud, Zahn and Sexauer had superior knowledge to Foodbrands regarding DFG's failure to meet financial performance

13

criteria, knew and had reason to know that Foodbrands lacked such knowledge, and took advantage of their superior knowledge to net financial gain at Foodbrands' expense.

### INVENTORY ACCOUNTING

44.     Because Foodbrands depended heavily upon accurate accounting and financial reporting to manage its subsidiaries, Foodbrands required its constituent companies to: perform two physical inventories, utilize a standard cost-based system of valuing inventory based on actual costs of production, and otherwise comply with the requirements of GAAP. These procedures helped maximize the accuracy of the companies' inventory accounting records regarding the amount and value of inventory.

45.     Shortly after Plaintiffs positioned DFG as a subsidiary of Foodbrands in October 1998, employees of Foodbrands informed Zahn and Sexauer that under Foodbrands' accounting policies, DFG had to perform two physical inventories per year and employ a standard cost inventory valuation system based on actual costs of production. Those Foodbrands employees provided Zahn and Sexauer a copy of Foodbrands' Accounting Policies and Procedures Manual, which specifically stated in writing that Foodbrands required its companies to perform two physical inventories per year and employ a standard cost inventory valuation system based on actual costs of production. Zahn and Sexauer agreed to implement all of Foodbrands' accounting policies and procedures and perform its inventory accounting in compliance with GAAP.

46.     From the time Plaintiffs consolidated Diversified, Cohen's, and Restauranic into DFG in October 1998 until the fall of 1999, Zahn and Sexauer regularly submitted financial reports purporting to value DFG's inventory, which reports Zahn and Sexauer knew and had reason to know were false.

14

47. From the time IBP consolidated Diversified, Cohen's, and Restauranic into DFG in October 1998 until the fall of 1999, Zahn and Sexauer had frequent contact with Foodbrands financial and operations staff in the monthly management meetings, weekly telephone conference calls, and other daily business contacts via phone calls, faxes, and e-mails that Foodbrands used as a key means of managing DFG. In all of these contacts, Zahn and Sexauer led Foodbrands personnel to believe that Zahn and Sexauer had complied with Foodbrands' accounting policies and procedures and GAAP, knowing and having reason to know that they had not complied with either.

48. From October 1998 until the fall of 1999, Zahn and Sexauer were fiduciaries of DFG and Foodbrands and thus had the responsibility to make full and complete disclosure of all material information relating to the operation of DFG.

49. From October 1998 until the fall of 1999, neither Zahn nor Sexauer informed Foodbrands that they had in fact failed to implement the policies and procedures in Foodbrands' Accounting Policies and Procedures Manual relating to inventory accounting. Neither Zahn nor Sexauer informed Foodbrands that they had failed to cause any physical inventories to be performed and had failed to implement a standard cost inventory valuation system based on actual costs of production. Neither Zahn nor Sexauer informed Foodbrands that they had failed to cause DFG's inventory accounting to comply with GAAP.

50. Beginning in October 1998 and continuing thereafter, for the purpose of executing their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly made and caused to be made millions of dollars of wholly fictitious entries in DFG's inventory accounting system, which entries entirely lacked basis or support.

51.    Beginning in October 1998 and continuing thereafter, for the purpose of executing their scheme to defraud, Zahn and Sexauer employed and caused to be employed a method of valuing inventory at DFG that Zahn and Sexauer knew and had reason to know falsely and fraudulently inflated DFG's inventory records and thus the earnings of DFG, falsely presenting a more positive financial picture of DFG than existed in reality. As a result, Plaintiffs were not informed of and given the opportunity to remedy serious operational and business problems that existed at DFG, causing Plaintiffs additional harm.

52.    During the course of the time Zahn and Sexauer employed and caused to be employed the foregoing false and fraudulent inventory valuation method at DFG, Zahn and Sexauer repeatedly received information directly and through others reporting to them demonstrating that the inventory valuation method that they used and caused to be used at DFG had produced and would produce false and fraudulently inflated inventory records, which thus inflated the earnings of DFG and falsely presented a more positive financial picture of DFG than existed in reality. Notwithstanding this, Zahn and Sexauer continued to use the flawed inventory valuation method to further inflate DFG's inventory records and financial reports and thus the earnings of DFG, so as to falsely present to Foodbrands a more positive financial picture of DFG than existed in reality.

53.    During the course of the time Zahn and Sexauer employed and caused to be employed the foregoing false and fraudulent inventory valuation method at DFG, Zahn and Sexauer knowingly, intentionally, and recklessly submitted and caused to be submitted to Foodbrands numerous financial reports and accounting analyses which included inventory valuation figures that Zahn and Sexauer knew and had reason to know falsely inflated the earnings of DFG and presented a more positive financial picture of DFG than existed in reality.

54. By policy, Foodbrands performed an internal audit of each of its business units on an annual basis. The purpose of the audits was to determine if the businesses were complying with Foodbrands' accounting policies and with other operating regulations.

55. Foodbrands caused DFG's first audit to take place in November 1999, about one year after it was acquired.

56. In or about November 1999, Foodbrands' audit revealed that DFG had not instituted a standard cost system of valuing inventory based on actual costs of production and had used a method of inventory valuation that did not comport with either Foodbrands' Accounting Policies and Procedures Manual or GAAP.

57. Upon information and belief, at the time Foodbrands discussed their audit with Zahn and Sexauer, Zahn and Sexauer knew and had reason to know that Foodbrands: had not discovered that Zahn and Sexauer had advanced their scheme to defraud Foodbrands by manipulating and falsely inflating DFG's inventory valuation figures; had not discovered the fact that Zahn and Sexauer had already received actual cost figures for DFG's inventory and had intentionally failed to use them; had not discovered the fact that Zahn and Sexauer had inflated DFG's inventory valuation figures far more substantially than Foodbrands suspected; and did not know that Zahn and Sexauer knowingly, intentionally, and recklessly misrepresented to Foodbrands the nature and extent of the inventory valuation issue that arose during the audit and that Zahn and Sexauer made false and fraudulent assurances how such valuation issues would quickly be resolved.

58. Beginning in or about November and December 1999 and continuing until in or about September 2000, Zahn and Sexauer knowingly, intentionally, and recklessly made and caused to be made a series of false statements to Foodbrands designed to conceal the scheme

17

to defraud and to lull Plaintiffs into a false sense of security regarding the state of the inventory accounting records and financial reports of DFG. The statements Zahn, Sexauer, and another senior DFG accounting employee made and caused to be made to Foodbrands for the purpose of concealing the scheme to defraud and lulling Plaintiffs into a false sense of security regarding the state of the inventory accounting records and financial reports of DFG included statements that Zahn, Sexauer and another senior DFG accounting employee would see to it that:

- by year-end 1999, the DFG books would incorporate all necessary costs so that the inventory would be valued correctly;

- by year-end 1999, DFG would perform a physical audit and reconcile the DFG inventory accounts before they closed DFG's books at year-end; and

- for the year 2000, DFG would implement at DFG a standard cost system of valuing inventory based on actual costs of production.

59. Beginning in or about January 2000 and continuing until in our about September 2000, Zahn knowingly, intentionally, and recklessly made and caused to be made additional statements designed to conceal the scheme to defraud and to lull Plaintiffs into a false sense of security regarding the state of the accounting records and financial reports of DFG. Among these statements, Zahn repeatedly made and caused to be made statements designed to assure the internal auditors that DFG was instituting a new inventory valuation system based on actual costs.

60. Notwithstanding the foregoing, Zahn and Sexauer knowingly, intentionally, and recklessly did not take the steps they promised Foodbrands they would take to address the inventory valuation issues Foodbrands had raised. Zahn and Sexauer:

- never incorporated actual costs in DFG's 1999 inventory records to obtain accurate valuations;

- never reversed out the false and fictitious inventory entries they had made and caused to be made in DFG's 1999 inventory accounting records;

18

- never caused DFG to reconcile its 1999 inventory numbers against a physical inventory and other accounts as they assured Foodbrands they would; and

- never implemented for 2000 a standard cost-based inventory accounting system based on actual costs as they repeatedly said they would.

61.     Instead, in furtherance of the scheme to defraud, in late 1999 and 2000, Zahn repeatedly cancelled physical inventories that had been scheduled and continued to use and cause to be used at DFG a method of inventory valuation that artificially inflated inventory levels, deceptively failed to record accurate expenses of production, and falsely inflated earnings, well knowing and having reason to know that Foodbrands was relying upon the financial reports and accounting analyses that DFG was submitting based upon these false and fraudulent inventory figures.

62.     As a result of Zahn's continuation in 2000 of the false and fraudulent method of inventory valuation he and Sexauer employed in 1999, DFG's inventory valuation became more falsely inflated in 2000. Zahn knew and had reason to know that Foodbrands would rely upon these false numbers and failed to disclose to Foodbrands the fact that he had continued to use false and fraudulent inventory valuations.

63.     Beginning in October 1998 and continuing until September 2000, as a result of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly caused DFG's inventory records to be overvalued by approximately $35,000,000 so as to inflate the earnings of DFG and to present to Foodbrands a more positive financial picture of DFG than existed in reality.

**ACCOUNTS RECEIVABLE**

64.     Because Foodbrands depended heavily upon accurate accounting and financial reporting to manage its subsidiaries, Foodbrands required its constituent companies to comply with the requirements of Foodbrands' Accounting Policies and Procedures Manual and

GAAP with respect to accounting for accounts receivable. One major purpose behind these procedures was to maximize the accuracy of the companies' accounts receivable records to see to it that they accurately reflected all amounts owed to the companies that were collectible, but did not include amounts that were not collectible.

65.    Foodbrands Accounting Policies and Procedures Manual, Policy No. 210, provides: "The write-off of an accounts receivable and the removal of the balance from the accounts receivable subledger will be initiated only when the customer's receivable is totally uncollectible and no further collection effort is warranted. This procedure is not to be used for normal business customer adjustments, such as, ... price adjustments....If a customer's account is deemed totally uncollectible by the Credit Manager, proper approvals should be obtained and the amount should be written off." Foodbrands' Accounting Policies and Procedures Manual also provides that the controller of the business units, here DFG, must review all open accounts receivable for collection at least quarterly and that all accounts more than 90 days overdue must be analyzed to determine whether a reserve should be included in the books and/or a specific collection program should be set up.

66.    When an account receivable has been on a company's books for an extended period of time, GAAP requires that the company either determine that the debt is still collectible and if it is not deemed collectible, GAAP requires that the accounts receivable be written-off or reserved for as a bad debt on the company's books.

67.    Shortly after Plaintiffs positioned DFG as a subsidiary of Foodbrands in October 1998, employees of Foodbrands informed Zahn and Sexauer that under Foodbrands' accounting policies, DFG had to perform its accounting in compliance with Foodbrands'

Accounting Policies and Procedures Manual and GAAP. Zahn and Sexauer said that they would do so.

68. In or about November 1999, as a result of the audit referenced-above, Foodbrands discovered that DFG's books for accounts receivable appeared to contain a significant amount of bad debt and accounting errors. Foodbrands discussed this finding with Zahn, Sexauer, and other senior DFG executives that reported to Zahn and Sexauer.

69. Upon information and belief, in or about November 1999 at the latest, Zahn and Sexauer knew and had reason to know that DFG's accounts receivable incorporated large amounts of uncollectible receivables or bad debt, which should have been reserved for or written-off.

70. Beginning in or about December 1999 and continuing until in or about September 2000, Zahn and Sexauer knowingly, intentionally and recklessly made and caused to be made numerous false and fraudulent statements and representations to Foodbrands and omitted to disclose material information relating to DFG's accounts receivable. By these false and fraudulent statements, representations and material omissions, Zahn and Sexauer knowingly, intentionally, and recklessly concealed that DFG's financial records, and misrepresented the earnings and other financial condition of DFG by concealing the fact that those records continued to carry millions of dollars in accounts receivable that Zahn and Sexauer knew and had reason to know was an uncollectible bad debt and which should have been reserved for or written-off.

71. In or about December 1999, Sexauer, acting knowingly, intentionally, and recklessly, falsely told Foodbrands personnel that the accounts receivable items that Foodbrands

had identified in the November 1999 audit were fully collectible and that there were just "paperwork issues."

72.     Beginning in or about December 1999 and continuing until in or about September 2000, Zahn and Sexauer regularly submitted financial reports and accounting analyses to Foodbrands purporting accurately to reflect DFG's accounts receivable.  In all of these contacts, Zahn and Sexauer led Foodbrands personnel to believe that Zahn and Sexauer had caused DFG's accounts receivable records to comply with Foodbrands' accounting policies and procedures and with GAAP, knowing and having reason to know that they had not caused the records to comply with either.

73.     Zahn and Sexauer were fiduciaries of DFG and Foodbrands and thus had the responsibility to make full and complete disclosure of all material information relating to the operation of DFG, including its accounts receivable records.

74.     Neither Zahn nor Sexauer informed Foodbrands that they had knowingly, intentionally, and recklessly failed to fulfill their representation that they would implement Foodbrands' accounting policies and procedures relating to accounts receivable.  Neither Zahn nor Sexauer informed Foodbrands that they had knowingly, intentionally, and recklessly failed to fulfill their representation that they would cause DFG's accounts receivable records to comply with GAAP.

75.     Beginning in or about November and December 1999 and continuing until in or about September 2000, Zahn and Sexauer knowingly, intentionally, and recklessly took a series of actions designed to conceal the scheme to defraud and to lull Plaintiffs into a false sense of security regarding the state of the accounts receivable records and financial reports of DFG.  The actions Zahn and Sexauer undertook and caused to be undertaken for the purpose

of concealing the scheme to defraud and of lulling Plaintiffs into a false sense of security

regarding the state of the accounts receivable records and financial reports of DFG included:

- repeatedly resisting Foodbrands' efforts to send Foodbrands staffpeople to DFG to review and help collect these alleged receivables;

- transferring large amounts of receivables into other asset accounts to deceive the auditors into believing that the DFG was addressing the account receivables problem;

- including freight charges on the DFG books as accounts receivable that they knew and had reason to know were so extraordinarily speculative that their inclusion on the DFG books violated the requirements of Foodbrands accounting policies and GAAP.

76.     From January 2000 until August 2000, when DFG employees confirmed

that millions of dollars in accounts receivable were not collectible and should have been

immediately written-off the DFG books under the requirements of Foodbrands accounting

policies and GAAP, Zahn specifically directed that the items were not to be written off the DFG

books.  Throughout this period, Zahn knowingly, intentionally, and recklessly continued to

submit to Foodbrands financial reports and accounting analyses, which included and concealed

these millions of dollars in bad debt expense.

77.     Beginning in October 1998 and continuing until September 2000, as a

result of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly

caused DFG's accounts receivable records to be overvalued by more than $5,000,000 to inflate

the earnings of DFG and to present to Foodbrands a more positive financial picture of DFG than

existed in reality.

## PREPAID EXPENSES

78.     Because Foodbrands depended heavily upon accurate accounting and

financial reporting to manage its subsidiaries, Foodbrands required its companies to consistently

comply with the requirements of Foodbrands' Accounting Policies and Procedures Manual and

GAAP with respect to accounting for prepaid expenses.  Under Foodbrands accounting policies

and GAAP, costs that are properly classified as a prepaid expense may be charged as expenses over an extended period rather in their entirety at the time they are incurred. The financial benefit of this is that it delays and disperses the impact of the costs.

79.     Among other things, Foodbrands' accounting policies and GAAP limitations regarding the proper handling of prepaid expenses are designed to make sure that only certain categories of costs qualify for treatment as prepaid expenses. Foodbrands' policy and GAAP permit a company to treat expenses it incurs as prepaid expense (and spread out the impact of the expense into the future) only if that portion of at least a part of the expense does not benefit the company presently and only does so in future periods. If the expense relates exclusively to a current or past benefit – e.g., something provided currently or previously – Foodbrands' policy and GAAP requires the company to take the expenditures as an expense immediately – that is, have an immediate impact on a company's income.

80.     Beginning in October 1998 and continuing until September 2000, Zahn knowingly, intentionally, and recklessly engaged in an ongoing course of artificially inflating earnings by falsely failing to recognize millions of dollars in costs as current expenses and instead putting off their negative impact on DFG's earnings by classifying them as prepaid marketing and other prepaid accounts, well knowing that such entries were false because they were not properly classified as prepaid expenses.

81.     Beginning in October 1998, in furtherance of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly caused Zahn's expenses for past travel to be classified as prepaid marketing in violation of Foodbrands' accounting policies and GAAP. Instead of appropriately treating the travel as a current expense which would have a

negative effect on the DFG's profitability, Zahn and Sexauer caused those charges to be classified as prepaid marketing and slowly written-off over time.

82.    Beginning in October 1998, in furtherance of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly placed other costs into various prepaid accounts and never wrote them off, in violation of Foodbrands' accounting policies and procedures.

83.    Beginning in October 1998, in furtherance of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly added large amounts of fictitious entries to various prepaid accounts for the purpose of falsely inflating the assets of DFG.

84.    Beginning in or about October 1998 and continuing until in or about September 2000, Zahn and Sexauer regularly submitted and caused to be submitted financial reports and accounting analyses to Foodbrands purporting accurately to reflect DFG's prepaid expenses. In all of these contacts, Zahn and Sexauer knowingly, intentionally, and recklessly led Foodbrands personnel to believe that Zahn and Sexauer had caused DFG's prepaid accounts to comply with Foodbrands' accounting policies and procedures and with GAAP, knowing and having reason to know that they had not caused the records to comply with either.

85.    Zahn and Sexauer were fiduciaries of DFG and Foodbrands and thus had the responsibility to make full and complete disclosure of all material information relating to the operation of DFG, including its prepaid expenses.

86.    Neither Zahn nor Sexauer informed Foodbrands that they had knowingly, intentionally, and recklessly failed to fulfill their representation to Foodbrands that they would implement Foodbrands' accounting policies and procedures relating to prepaid expenses. Neither Zahn nor Sexauer informed Foodbrands that they had knowingly, intentionally, and

recklessly failed to fulfill their representation to Foodbrands that they would cause DFG's prepaid accounts to comply with GAAP.

87. Beginning in or about November and December 1999 and continuing until in or about September 2000, Zahn and Sexauer knowingly, intentionally, and recklessly made and caused to be made a series of statements to Foodbrands designed to conceal the scheme to defraud and to lull Plaintiffs into a false sense of security regarding the state of the accounting records and financial reports of DFG including prepaid accounts.

88. During the November 1999 audit, Zahn and Sexauer knowingly, intentionally, and recklessly provided a workpaper to Foodbrands that falsely represented that most of the prepaid expenses on DFG's books were being expensed by the end of the year. The workpaper did not reflect any expenses that were being spread out past year-end.

89. At the time Zahn and Sexauer provided Foodbrands with the foregoing workpaper, they knew and had reason to know that it contained false and fraudulent information in that it failed to disclose that Zahn and Sexauer had already falsely and fraudulently caused millions of dollars in current and past expenses to be classified as prepaid costs.

90. Beginning in October 1998 and continuing until September 2000, as a result of their scheme to defraud, Zahn and Sexauer knowingly, intentionally, and recklessly caused DFG's prepaid accounts to include more than $5,000,000 in fictitious expenses and expenses that should have been written-off immediately, so as to inflate the earnings of DFG and thus present to Foodbrands a more positive earnings picture of DFG than existed in reality.

## ZAHN SELF-DEALING/EMBEZZLEMENTS

91. Beginning in October 1998 and continuing until September 2000, as a part of his scheme to defraud, Zahn repeatedly engaged in false and fraudulent self-dealing by

causing DFG to make unauthorized payments to third parties for the personal financial benefit of Zahn and his family, in violation of the fiduciary duty Zahn owed Plaintiffs as an officer of DFG and Foodbrands.

92.     Beginning in October 1998 and continuing until September 2000, Zahn falsely and fraudulently directed DFG employees to utilize DFG funds to pay hundreds of thousands of dollars to third parties for the personal financial benefit of Zahn and his family, including payment of $40,000 for Zahn's seat on the Board of Directors of Hey.com, well knowing and having reason to know that these payments were not approved by Foodbrands and were in violation of the Plaintiffs' business policies.

93.     Beginning in October 1998 and continuing until September 2000, Zahn knowingly, intentionally, and recklessly caused DFG to engage in business with third party businesses in which Zahn had a personal financial interest, including Pinnacle Products, Inc., falsely and fraudulently failing to disclose that personal financial interest to Foodbrands.

94.     Beginning in October 1998 and continuing until September 2000, Zahn falsely and fraudulently caused his family members to be included in DFG's health insurance plan, well knowing that those family members did not qualify for coverage under that plan.

95.     Throughout the course of his scheme to defraud, Zahn had superior knowledge to Foodbrands regarding DFG's failure to meet financial performance criteria, knew and had reason to know that Foodbrands lacked such knowledge, and took advantage of his superior knowledge to net financial gain at Foodbrands' expense. At the time he was negotiating earn out payments with Foodbrands that would benefit himself and other former owners of Diversified, Cohen's, Restauranic, and Wilton, Zahn was aware that DFG's income was overstated as a result of fictitious sales invoices and other false and fraudulent accounting and

financial records. Zahn did not disclose the facts relating to his superior knowledge on this score nor did he direct that DFG's accounting records be restated or corrected to rectify these overstatements. Instead, Zahn took advantage of his superior knowledge. One way Zahn took advantage of his superior knowledge to his personal financial gain and Foodbrands' detriment was to cause DFG's overstated 1999 results to be reported to Foodbrands so as fraudulently to cause Foodbrands to make a contingent purchase price payment to Zahn and others totaling approximately $7,762,765.

96.     One example of the way in which Zahn used his superior knowledge to his personal financial benefit and to Plaintiffs' detriment occurred in 2000, at the time Zahn was presenting information to Plaintiffs in support of the 1999 contingent purchase payment Plaintiffs made in April 2000. At the time, Zahn was aware that DFG's income had been overstated by, among other things, DFG's inclusion of approximately $500,000 of fictitious sales invoices being entered in DFG's records. Zahn did not direct that such sales be removed from DFG's 1999 results and instead caused DFG's results for 1999 to remain overstated, to his personal financial benefit and Plaintiffs' detriment.

97.     As a fiduciary of DFG and Foodbrands, Zahn had the duty to refrain from self-dealing at the expense of Foodbrands and IBP without making full and complete disclosure to IBP and Foodbrands. Zahn made no such disclosure and repeatedly engaged in such conduct to the substantial detriment of the Plaintiffs.

28

## FIRST CAUSE OF ACTION
### (FRAUD)

98.     Plaintiffs allege and incorporate by reference each and every foregoing paragraph as if fully set forth herein.

99.     Zahn and Sexauer knowingly, intentionally, and recklessly employed the scheme to defraud set forth in the foregoing paragraphs such that: Zahn and Sexauer made the statements set forth in the foregoing paragraphs, which statements were knowing, intentional, and reckless false statements of material facts and which statements Zahn and Sexauer knew and had reason to know to be false, believed to be false, and made in reckless disregarded whether they were true or false. Zahn and Sexauer made the statements with the intent to induce: Plaintiffs to make payments under the Asset Purchase Agreement and Amended Asset Purchase Agreement; Plaintiffs to forebear from intervening in defendants' operation of DFG; Plaintiffs to be lulled into a false sense of security regarding the state of the accounting records and financial reports of DFG; and DFG to make unauthorized payments to third parties for the personal financial benefit of Zahn and his family. Plaintiffs reasonably believed the statements and acted in justifiable reliance upon the truth of the statements and sustained damages as a result of their reliance.

100.    Zahn and Sexauer knowingly, intentionally, and recklessly employed the scheme to defraud set forth in the foregoing paragraphs such that Zahn and Sexauer concealed and withheld from Plaintiffs material facts set forth in the foregoing paragraphs with the intent to deceive Plaintiffs and induce: Plaintiffs to make payments under the Asset Purchase Agreement and Amended Asset Purchase Agreement; Plaintiffs to forebear from intervening in

defendants' operation of DFG; Plaintiffs to be lulled into a false sense of security regarding the state of the accounting records and financial reports of DFG; and DFG to make unauthorized payments to third parties for the personal financial benefit of Zahn and his family. Plaintiffs acted in justifiable reliance upon the facts as they knew them and sustained damages as a result of the concealment and withholding of material facts by Zahn and Sexauer.

101.    The aforementioned conduct of Zahn and Sexauer was a knowing, intentional, and reckless misrepresentation, deceit and/or concealment of material facts conducted with the intention of depriving Plaintiffs of property, legal rights, and/or otherwise causing injury, and was willful, wanton, malicious, and a violation of trust or confidence, so that justice and public good require an award of exemplary and punitive damages.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY BY ZAHN)

102.    Plaintiffs allege and incorporate by reference each and every foregoing

paragraph as if fully set forth herein.

103.    Zahn, as an officer of Foodbrands and DFG owed fiduciary duties to IBP

and IBP's shareholders, Foodbrands, and DFG.

104.    Zahn breached those fiduciary duties owed to IBP and IBP's shareholders,

Foodbrands, and DFG by, among other things:

a.    making and causing to be made false and fraudulent statements and representations in the accounting records and financial reports of DFG, including falsely inflating DFG's inventory records;

b.    omitting and causing be omitted from the accounting records and financial reports of DFG material information relating to the financial position and business operations of DFG, including failing to disclose to Foodbrands that he had a personal financial interest in Pinnacle Products, Inc. and failing to disclose to Foodbrands that he had caused receivables to be added to DFG's books in 2000 that they knew and had reason to know were so highly speculative as to not be proper to be added to DFG's books;

c.    making and causing to be made statements and other representations to Plaintiffs' employees designed to lull Plaintiffs into a false sense of security regarding the state of the accounting records and financial reports of DFG after Plaintiffs' employees began to question the propriety of some of the false and fraudulent statements and representations Zahn and Sexauer made and caused to be made in the accounting records and financial reports of DFG, including that DFG would, by year-end 1999, cause all costs of

31

producing inventory to be removed from DFG's 1999 inventory accounts;

d.  repeatedly taking steps to conceal from Plaintiffs the fact that Zahn and Sexauer had made and caused to be made false and fraudulent statements and representations and material omissions from the accounting records and financial reports of DFG in furtherance of the foregoing false and fraudulent activity, including by directing DFG personnel not to write-off receivables that Zahn knew and had reason to know were not collectible and to shift those receivables from account-to-account to evade detection;

e.  engaging in undisclosed self-dealing without obtaining the approval of Foodbrands, including causing DFG to pay $40,000 for Zahn's seat on the Board of Directors of Hey.com;

f.  by knowing of, and failing to disclose to Foodbrands and DFG the fact that the foregoing actions were occurring;

g.  by authorizing accounting practices that he knew and had reason to know did not meet Foodbrands' standards, including canceling physical inventories in late 1999 and 2000 and continuing a method of inventory valuation that he knew and had reason to know violated Foodbrands' policies.

105.    The aforementioned conduct of Zahn was conducted with the intention of depriving Plaintiffs of property, legal rights, and/or otherwise causing injury, and was willful, wanton, malicious, and a violation of trust or confidence, so that justice and public good require an award of exemplary and punitive damages and the forfeiture of Zahn's salary for the period during which his breach was occurring.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## THIRD CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY BY SEXAUER)

106.    Plaintiffs allege and incorporate by reference each and every foregoing paragraph as if fully set forth herein.

107.    By knowingly, intentionally, and recklessly assisting Zahn in breaching his fiduciary duties to Foodbrands and DFG, Sexauer aided and abetted Zahn in breaching his fiduciary duties owed to Foodbrands and DFG.

108.    Sexauer also knowingly, intentionally, and recklessly concealed Zahn's breach of his fiduciary duties, thereby further aiding and abetting Zahn in breaching those duties.

109.    IBP and Foodbrands have suffered damages as a result of Sexauer's assisting Zahn in breaching his fiduciary duties owed to Foodbrands and DFG.

110.    The aforementioned conduct of Sexauer was conducted with the intention of depriving Plaintiffs of property, legal rights, and/or otherwise causing injury, and was willful, wanton, malicious, and a violation of trust or confidence, so that justice and public good require an award of exemplary and punitive damages and the forfeiture of Sexauer's salary for the period during which the breach was occurring.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## FOURTH CAUSE OF ACTION
## (CIVIL CONSPIRACY)

111.  Plaintiffs allege and incorporate by reference each and every foregoing paragraph as if fully set forth herein.

112.  Zahn and Sexauer combined through concerted action, as detailed in each and every foregoing paragraphs, to defraud Plaintiffs by means of false and deceitful statements, material omissions, and by breaching the fiduciary duties they owed to the Plaintiffs.

113.  Zahn and Sexauer agreed to perform and did perform or cause to be performed *overt* acts in furtherance of the conspiracy, as detailed in the foregoing paragraphs, including paragraph 104 a.-g.

114.  The conspiracy caused injury to the Plaintiffs, as detailed in each and every foregoing paragraph.

115.  The aforementioned conduct of Zahn and Sexauer was conducted with the intention of depriving the Plaintiffs of property, legal rights, and/or otherwise causing injury, and was willful, wanton, malicious, and a violation of trust or confidence, so that justice and public good require an award of exemplary and punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter orders as follows:

### RELIEF

1.  For compensatory damages, those losses sustained by the Plaintiffs as a result of the conduct of Zahn and Sexauer, with the specific amount to be proven at trial,

including but are not limited to: payment of purchase price adjustment and contingent purchase price payments in excess of $9.3 Million and goodwill impairment of $60.3 Million;

        2.      For exemplary and punitive damages;

        3.      For forfeiture of the salaries of Zahn and Sexauer for the period they breached their fiduciary duty and aided and abetted the breach of fiduciary duty;

        4.      For such other and further relief as the Court deems just and proper.

Dated: August 22, 2001

                    SIDLEY, AUSTIN, BROWN & WOOD

By _____
                    Scott T. Mendeloff
                    Attorney for Plaintiffs IBP, inc. and Foodbrands
                    America, Inc.

SIDLEY & AUSTIN
 Scott T. Mendeloff
 Colleen Kenney
 Ten Bank One Plaza
 Chicago, Illinois 60603
 Telephone: (312) 853-7000

JURY TRIAL DEMANDED

CHI 2246806v4

JS 44
(Rev. 12/96)



# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**DOCKETED**

## I. (a) PLAINTIFFS
IBP, INC., and FOODBRANDS
AMERICA, INC.

JUDGE SHADUR

**DEFENDANTS**
ANDREW J. ZAHN, and
PHILIP SEXAUER

01C 6529

AUG 2-2 2001

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Union County, SD
(EXCEPT IN U.S. PLAINTIFF CASES)

MAGISTRATE JUDGE KEYS

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Lake County, IL
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Scott T. Mendeloff
Sidley Austin Brown & Wood
10 South Dearborn
Chicago, IL  60603  312-853-7362

ATTORNEYS (IF KNOWN)
Tom McQueen                              Royal B. Martin
Jenner & Block                          321 S. Plymouth Court, 10th Fl
One IBM Plaza, Ste. 4400                Chicago, IL  60604
Chicago, IL 60611  312-222-9350         312-360-5000

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)  AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. §§ 1331, 1332

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ 70,000,000

CHECK YES only if demanded in complaint
JURY DEMAND:  ☒ YES  ☐ NO

**VIII.** This case  ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
08/22/01

SIGNATURE OF ATTORNEY OF RECORD
Scott Mendeloff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

IBP, INC., and FOODBRANDS AMERICA, INC.
Plaintiffs,

v.

ANDREW J. ZAHN, and
PHILIP SEXAUER,
Defendants.

JUDGE SHADUR

MAGISTRATE JUDGE KEYS
Case Number:

DOCKET

AUG 2 2 2

**01C 6529**

FILED-EDS   01 AUG 22  AM 11:41   CLERK U.S. DISTRICT COURT

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Scott T. Mendeloff | NAME Colleen Kenney |
| FIRM Sidley Austin Brown & Wood | FIRM Sidley Austin Brown & Wood |
| STREET ADDRESS 10 South Dearborn | STREET ADDRESS 10 South Dearborn |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP Chicago, IL 60603 |
| TELEPHONE NUMBER 312-853-7362  FAX NUMBER 312-853-7036 | TELEPHONE NUMBER 312-853-4166  FAX NUMBER 312-853-7036 |
| E-MAIL ADDRESS smendelo@sidley.com | E-MAIL ADDRESS ckenney@sidley.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6184901 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6207221 |
| MEMBER OF TRIAL BAR?  YES ☒  NO ☐ | MEMBER OF TRIAL BAR?  YES ☐  NO ☐ |
| TRIAL ATTORNEY?  YES ☒  NO ☐ | TRIAL ATTORNEY?  YES ☒  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☒ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER  FAX NUMBER | TELEPHONE NUMBER  FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☐ | MEMBER OF TRIAL BAR?  YES ☐  NO ☐ |
| TRIAL ATTORNEY?  YES ☐  NO ☐ | TRIAL ATTORNEY?  YES ☐  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ |